

# IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS

---

### NO. PD-0624-20

---

### DALLAS SHANE CURLEE, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### JACKSON COUNTY

---

WALKER, J., delivered the opinion of the Court in which KELLER, P.J., and HERVEY, RICHARDSON, NEWELL, KEEL, SLAUGHTER, and MCCLURE, JJ., joined. KELLER, P.J., filed a concurring opinion in which RICHARDSON, SLAUGHTER, and MCCLURE, JJ., joined. YEARY, J., filed a dissenting opinion.

### O P I N I O N

Dallas Shane Curlee, Appellant, was convicted of possession of a controlled substance within 1,000 feet of a drug-free zone, namely, a playground. Appellant challenges the sufficiency of the evidence showing a playground, specifically, the requirement that the playground was "open to the public."

The evidence germane to the "open to the public" element consisted of the fact that the

playground was surrounded by a chain link fence that was not completely locked, an officer's conclusory testimony that the playground was open to the public, the playground's location on the premises of a church, and the fact that the playground could be seen through the fence. We conclude that a rational jury could not conclude, beyond a reasonable doubt, that the playground was "open to the public" based on the evidence presented at trial. The evidence is insufficient to support the "open to the public" element of a playground, and we reverse the judgment of the court of appeals.

## I — Background

Appellant's friend, Hillary Hammond, drove her van to the Jackson County Jail to visit an inmate. She parked the van on the street in front of the jail, and Appellant waited inside the van. Hammond brought into the jail a plastic bag which held five boxes of contact lenses. Jail Sergeant Dave Thedford searched the bag and found, in one of the boxes of contact lenses, four razor blades such as those used in box cutters. Thedford took the razor blades to Jail Captain James Omecinski, who in turn reported the incident to Jackson County Sheriff's Investigator Gary Smejkal. Hammond was arrested for bringing contraband into the jail. Smejkal interviewed Hammond, and she claimed that the blades were for the box cutter on her keychain. Hammond said she purchased the blades along with several other items from Wal-Mart a few days earlier, and the receipt for the purchase was in her van.

Smejkal felt it was necessary to have the receipt to verify Hammond's story, so he and Omecinski escorted Hammond to her van. Hammond asked if the van could be released to Appellant, who was sitting on the rear bench seat. Smejkal agreed, and he asked Appellant for his driver's license to determine whether the license was valid and whether there were any warrants. After discovering an outstanding arrest warrant for Appellant, Smejkal handcuffed Appellant and placed

him under arrest. There being no one the van could be released to, the van had to be towed and impounded.

Pursuant to sheriff's office policy, Smejkal conducted an inventory search of the van. During the search, Smejkal found a black baseball cap. The cap was located on the floor of the van in front of the rear bench seat where Appellant had been seated. The cap was upside down and held a pack of Marlboro cigarettes, Appellant's cell phone, a propane torch lighter, a glass pipe, a syringe, a Recon 1 folding pocketknife, and a scratch-off lottery ticket. Inside the pack of cigarettes were three small, yellow bags that contained a white crystalline substance. A brown purse belonging to Hammond was found between the front seats of the van. The purse contained some cash, a glass pipe, a plastic baggie containing almost a gram of methamphetamine, and several small empty baggies. Jessica Greene, a forensic scientist at the Corpus Christi Department of Public Safety Laboratory, tested the substance in one of the baggies that were inside the cigarette pack, and she identified the substance as methamphetamine with a net weight of 1.49 grams.[1]

A church with a playground was on the next block across the street from the jail where Hammond's van was parked. Smejkal performed a Google Maps search which indicated the distance between the van and the playground was 547.38 feet. Smejkal also used a rolling tape measure to determine the distance between the van and the playground, and he recorded a distance of 539.2 feet. A chain link fence surrounded the church playground, and the chain link fence included four gates.[2]

---

[1] Pursuant to laboratory policy, Greene did not test the substance in the other two bags because the combined net weight of the substance in all three bags would not have been over 4 grams and could not have increased the level of the offense.

[2] Photographs of the gates were admitted into evidence, and we have included them in Appendix A.

Three of the gates were not locked. The first unlocked gate was between the main church building and the meeting hall or dining room.[3] The second unlocked gate stood between the playground area and a storage building.[4] The third unlocked gate was actually incapable of being locked; there was no post for the yoke on the gate.[5] Instead, the yoke simply rested against the brick wall of the church building. This unlockable gate was accessible from a walkway between two of the church buildings.[6] The walkway itself was accessible by a metal gate locked with a single cylinder deadbolt lock.[7] The fourth gate in the fence surrounding the playground, between the playground and the street, was locked with a padlock.[8]

Smejkal entered the playground area through the first unlocked gate, which is shown in State's Exhibit 35. From the playground, Smejkal went through the unlockable gate shown in State's Exhibit 34 into the narrow walkway, where he unlocked the deadbolt locked gate from the inside, as seen from State's Exhibit 37. Smejkal then exited the gate, closed it, and then locked the gate from the outside, as seen from State's Exhibit 39, by reaching his hand through the gate and locking the deadbolt. Implicitly, Smejkal would have been able to gain access to the playground through the deadbolt locked gate shown in State's Exhibit 39 by reaching through the gate, unlocking the deadbolt, going through the narrow walkway, and opening the unlockable gate shown in State's

[3] Rep. R. vol. 6, State's Ex. 35; Appendix A.

[4] Rep. R. vol. 6, State's Ex. 36; Appendix A.

[5] Rep. R. vol. 6, State's Ex. 34; Appendix A.

[6] Rep. R. vol. 6, State's Ex. 39; Appendix A.

[7] Rep. R. vol. 6, State's Ex. 37; Appendix A.

[8] Rep. R. vol. 6, State's Ex. 38; Appendix A.

Exhibit 34.[9]

Appellant was charged by indictment with possession of 1–4 grams of methamphetamine in a drug-free zone, a third-degree felony, based on Hammond's van being within 1,000 of the church playground. Following a two-day trial and Appellant's plea of "True" to enhancement paragraphs alleging prior felony convictions, the jury found Appellant guilty and assessed a sentence of twenty years' imprisonment.

On appeal, Appellant challenged the sufficiency of the evidence of a drug-free zone. *Curlee v. State*, — S.W.3d —, No. 13-19-00237-CR, 2020 WL 3116332, at *1 (Tex. App.—Corpus Christi–Edinburg 2020).[10] The court of appeals found the evidence sufficient based on evidence that the playground was either 547.38 feet away or 539.2 feet away from the van; "none of the various gates to the playground were locked except one;"[11] "only one of [the entrances to the playground] is capable of being locked;"[12] and the playground contained two slides, a playscape, a tube, and monkey bars. *Id.* at *3–4. Accordingly, the court of appeals determined that the play area met the

---

[9] We note that when one stands outside the metal gate, it is not apparent that the gate can be unlocked by reaching through the fence. Smejkal noticed that the gate could be easily unlocked while he was inside the gate as depicted in State's Exhibit 37.

[10] Appellant also challenged the sufficiency of the evidence of possession and the trial court's denial of his motion for new trial. *Curlee*, 2020 WL 3116332, at *1.

[11] We note that while only one of the gates in the chain link fence was directly locked with a padlock, one of the unlocked gates was effectively locked. Smejkal explained that one of the unlocked gates was accessible through a walkway, and the walkway was behind a gate locked with a deadbolt, which is shown in State's Exhibits 37 and 39.

[12] We note that, of the unlocked gates shown in State's Exhibits 35 and 36, these gates appear to be similar to the gate shown in State's Exhibit 38, which is not only lockable, but actually locked by a padlock. Unlike the third gate shown in State's Exhibit 34, there was no evidence that the gates shown in State's Exhibits 35 and 36 were "unlockable."

statutory definition of a "playground." *Id.*

We granted Appellant's petition for discretionary review, which raised three grounds questioning the court of appeals's conclusion that the evidence was sufficient to show the playground was "open to the public."[13]

## II — Sufficiency of the Evidence

In assessing the sufficiency of the evidence to support a criminal conviction, reviewing courts "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243–44 (Tex. Crim. App. 2019) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence must be sufficient to establish each element of the offense. *Lee v. State*, 537 S.W.3d 924, 926 (Tex. Crim. App. 2017).

The sufficiency of the evidence is measured by comparing the evidence produced at trial to "the essential elements of the offense as defined by the hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge

---

[13] Specifically, Appellant's grounds for review are:

1. Under the Drug Free Zone statute, is an area with play equipment presumed to be "open to the public" freeing the State from having to produce legally sufficient evidence at trial?

2. Did the 13th Court of Appeals err by improperly analyzing the record for legally sufficient evidence proving that the "playground" was "open to the public" under the Drug Free Zone statute?

3. Did the 13th Court of Appeals err in finding that the area where it was alleged that Petitioner possessed drugs was a "playground" as defined by the Drug Free Zone statute?

"accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* The law "authorized by the indictment" consists of the statutory elements of the offense as modified by the indictment allegations. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

### III — Analysis

The indictment in Appellant's case alleged that he did:

> intentionally and knowingly possess a controlled substance, to-wit: Methamphetamine, in an amount by aggregate weight of more than 1 gram but less than 4 grams and said offense occurred in, on or within 1,000 feet of a playground, to-wit: First United Methodist Church, 216 W. Main Street, Edna, Jackson County, Texas.[14]

The indictment thus charged Appellant with violating the "Offense: Possession of Substance in Penalty Group 1" statute, Health and Safety Code § 481.115, which provides, in pertinent part:

> (a) Except as authorized by this chapter, a person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 1, unless the person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the course of professional practice.

Tex. Health & Safety Code Ann. §§ 481.115(a), 481.102(6) ("Penalty Group 1 consists of . . . (6) Methamphetamine . . . ."). The allegation that Appellant possessed one to four grams sets the degree of the offense:

> (c) An offense under Subsection (a) is a felony of the third degree if the amount of the controlled substance possessed is, by aggregate weight, including adulterants or dilutants, one gram or more but less than four grams.

*Id.* § 481.115(c).

---

[14] Clerk's R. 4.

The indictment included, however, additional allegations that enhance the punishment—the offense occurred in, on, or within 1,000 feet of a playground. The findings necessary to sustain punishment enhancements, though not strictly "elements of the offense necessary to sustain a conviction," are also subject to the same sufficiency review on appeal, and, accordingly, are part of the hypothetically jury charge analysis. *Young v. State*, 14 S.W.3d 748, 750 (Tex. Crim. App. 2000). The allegation that Appellant committed the offense within 1,000 feet of a playground invokes the "Drug-Free Zones" statute, § 481.134, which provides in pertinent part:

> (c) The minimum term of confinement or imprisonment for an offense otherwise punishable under Section . . . 481.115(c)–(f) . . . is increased by five years and the maximum fine for the offense is doubled if it is shown on the trial of the offense that the offense was committed:
>
> (1) in, on, or within 1,000 feet of the premises of a school, the premises of a public or private youth center, or a playground; or
>
> (2) on a school bus.

*Id.* § 481.134(c). A "playground" is defined by the statute:

> (3) "Playground" means any outdoor facility that is not on the premises of a school and that:
>
> (A) is intended for recreation;
>
> (B) is open to the public; and
>
> (C) contains three or more play stations intended for the recreation of children, such as slides, swing sets, and teeterboards.

*Id.* § 481.134(a)(3).

Thus, even though § 481.115(a) is violated by intentional or knowing possession of any amount of a drug listed in penalty group 1 without a valid prescription, the hypothetically correct jury charge by which we measure the sufficiency of the evidence would require that Appellant:

- intentionally and knowingly
- possessed
- more than 1 but less than 4 grams of
- methamphetamine
- within 1,000 feet
- of a playground
- at the First United Methodist Church in Edna.

At the court of appeals, Appellant challenged the sufficiency of the evidence of a drug-free zone, namely, a playground. *Curlee*, 2020 WL 3116332, at *2. The court of appeals found the evidence was sufficient:

> According to Smejkal's trial testimony, there was a church playground one block from where Hammond's van was parked and across the street. According to Google Maps, the distance was 547.38 feet from Hammond's van. Smejkal also measured the distance of 539.2 feet from Hammond's parking space to the middle of the playground with a rolling tape-measure he borrowed from the City of Edna. He did not calibrate the rolling tape and could not testify to its accuracy. Smejkal personally confirmed that none of the various gates to the playground were locked except one.[15]
>
> The photographs in evidence demonstrate a large play area with two slides, a playscape, a tube, and monkey bars. The large grassy area that surrounds that playground is fenced with multiple entrances, only one of which is capable of being locked.[16] Both measurements of the distance between where Hammond's van was parked and where the playground is located, one-and-a-half blocks away, equated to less than 550 feet. The standard for finding the distance to be a drug-free zone is within 1000 feet. The jury's answer is supported by legally sufficient evidence.

*Curlee*, 2020 WL 3116332, at *3–4. Appellant does not challenge the court of appeals's conclusions in regard to whether the playground was an outdoor facility, not on the premises of a school,

---

[15] Again, we note that although one gate was directly locked with a padlock, as shown in State's Exhibit 38, the gate shown in State's Exhibit 34 was indirectly locked by the deadbolt-locked gate that is shown in State's Exhibit 37 and 39.

[16] It also bears repeating that the two gates which were not locked, shown in State's Exhibits 35 and 36, appear to be lockable in the same manner as the gate shown in State's Exhibit 38. As for the gate shown in State's Exhibit 34, though it was itself not lockable, it could be, and was, indirectly locked with the deadbolt-locked gate shown in State's Exhibits 37 and 39.

intended for recreation, or contained three or more play stations intended for the recreation of children. The issue is whether there is evidence in the record showing that the alleged playground was "open to the public."

*III(A) — Fence Was Not Locked*

Appellant argues that the only evidence mentioned by the court of appeals relating to the "open to the public" element was the fact that all but one of the gates in the fence surrounding the playground were not locked. Appellant contends that the court of appeals placed undue reliance on the fence being unlocked, and he argues that the court of appeals's conclusion is at-odds with the decision by the Texarkana Court of Appeals in *Ingram v. State*, 213 S.W.3d 515 (Tex. App.—Texarkana 2007, no pet.).

In *Ingram*, the defendant was convicted of selling a controlled substance in a drug-free zone, and like in Appellant's case, the drug-free zone was alleged to be a playground. *Id.* at 517. The State argued in *Ingram* that the playground was "open to the public" because there was no evidence that the playground was fenced or enclosed. *Id.* at 518. Noting that city-owned public playgrounds are often fenced but are in fact open for public use, the court of appeals could "not agree that fencing or the lack thereof would be dispositive." *Id.*

Appellant's argument, that the court of appeals in this case placed undue reliance on the fence and this reliance is in conflict with *Ingram*, essentially reads "dispositive" in *Ingram* to mean "conclusive." That is not the case. As the *Ingram* court noted, a playground may be both surrounded by a fence and also open to the public. *Ingram*, 213 S.W.3d at 518. A playground could be unfenced

yet also closed to the public[17]—the playground could have no fence around it but be by a ranch house in the middle of a 400 acre family ranch, or it could be on the grounds of a private, members-only club with a gated entrance manned by a security guard. A playground could be surrounded by a fence and closed to the public, such as a playground in the backyard of a family home. If the homeowner is having his fenced replaced, and during this time period the backyard and the playground in the backyard are temporarily unfenced, the playground is not therefore "open to the public" due to the lack of a fence. And, finally, a playground could be unfenced and open to the public.

Thus, a fence, in and of itself, will not decide the matter of "open to the public." But neither is a fence irrelevant. Absent other evidence, the presence of a fence tends to show that the playground is closed to the public. If other evidence is presented showing, directly or circumstantially, that the fence serves a purpose other than keeping the public out, the fence may be probative evidence tending to show that the playground is "open to the public."

Of the evidence relating to the fence in this case, the court of appeals noted in its opinion that "Smejkal personally confirmed that none of the various gates to the playground were locked except

---

[17] For example, the Texarkana Court of Appeals in *Ingram* concluded that there was no evidence to support the "open to the public" element of a playground even though there was no fence around the playground. From the evidence in the record:

> The ownership of the park by an alumni association, generally a private organization, does not assist in the determination that the park is open to the public. The fact that a baseball field was on the property adds little, as there is likewise no proof that it is open to use by the public. The fact the property was located near a residential area and contained playground equipment shows no more than that some children may use the facility—not that the public at large had access or permission to use the property. It is not uncommon for a group of homeowners in a neighborhood to provide a playground and limit its use to the children living in the neighborhood.

*Ingram*, 213 S.W.3d at 518–19.

one." *Curlee*, 2020 WL 3116332, at *3. The evidence relating to the fence in this case shows that two of the gates were locked. The church actually locked one of the gates directly with a padlock, as shown in State's Exhibit 38, and locked one of the gates indirectly with a deadbolt, as shown in State's Exhibits 37 and 39.

The court of appeals also noted in its opinion that "[t]he large grassy area that surrounds that playground is fenced with multiple entrances, only one of which is capable of being locked." *Id.* at *4. But this is contrary to the record. The gates shown in State's Exhibits 35 and 36 are similar to the gate in State's Exhibit 38, which was locked with a padlock. There is no indication in the record that these two gates could not be locked in the same manner. Finally, while the gate shown in State's Exhibit 34 was not capable of being locked, it was indirectly locked by the gate shown in State's Exhibits 37 and 39.

The evidence relating to the fence shows that multiple entrances were effectively locked, and all of the gates could be locked, either directly or indirectly. The locked entrances indicate that the church intended to assert some level of control over access to the playground. The gate shown in State's Exhibit 38, directly adjacent to the public sidewalk and street, was visibly locked with a padlock. Furthermore, the gate shown in State's Exhibit 39 as seen from the sidewalk, with its metal gate, key-holed deadbolt lock, narrow walkway, and gate at the end of the walkway, is far from welcoming. The fact that the church's attempt to secure the playground area was inadequate does not mean that the church's playground was therefore "open to the public." Instead, the exhibits tend to show that the playground was closed to the public. We disagree with the court of appeals's determination that the evidence that some of the gates in the fence were not locked is evidence from which a rational jury could infer that the playground was "open to the public."

*III(B) — "Public" Within the Penal Code*

The State, in its brief, argues that "public" has been linked to "accessibility" in regard to various statutes in the Penal Code, and the playground in this case should be deemed "open to the public" because it is accessible to the public. For instance, the State suggests that the criminal trespass statute is instructive as to whether a given area is "open to the public." A person commits criminal trespass if the person enters or remains on the property of another without effective consent and the person had notice that entry is forbidden or received notice to depart but failed to do so. TEX. PENAL CODE Ann. § 30.05(a). Notice can take the form of a fence or other enclosure obviously designed to exclude intruders or contain livestock. *Id.* § 30.05(b)(2)(B). According to the State, the fence being unlocked indicates that the fence is not obviously designed to exclude intruders, which in turn indicates that the playground within the fence was "open to the public." The State argues that the fence in Appellant's case was not obviously designed to exclude intruders because:

> [It] clearly served another purpose obvious to any parent who has had to supervise a playing child. It tends to keep the playing child in a defined area where he may be supervised, and prevents him from leaving without some degree of effort and notice to the supervising parent. It also provides the supervising parent with a greater ability to monitor other adults of questionable character who may try to enter the playground while a child or children are playing. In short, the fence serves as a safety device for the children, not as a means of excluding any particular group of them from the playground.[18]

There are three problems with the State's argument relying on the trespass statute. First, while some of the gates in the fence were unlocked, other gates were in fact locked. Insofar as criminal trespass is concerned, locked gates have been held to constitute notice that entry is forbidden. *See Munns v. State*, 412 S.W.3d 95, 100 (Tex. App.—Texarkana 2013, no pet.) ("[L]ocks would be sufficient

---

[18] Br. for the State at 14.

notice to a naked trespasser that entry was forbidden" and "a locked door would certainly qualify as notice to a naked trespasser."); *In re D.L.K.*, 690 S.W.2d 654, 655 (Tex. App.—Eastland 1985, no writ) (fencing and locked gates sufficient to provide notice that entry is forbidden).

Second, broadly speaking the State's position would characterize a playground as "open to the public" if the fence surrounding it is not obviously designed to exclude intruders. Certainly, a fence obviously designed to exclude intruders would be strong evidence that a playground is closed to the public. But the lack of a fence, let alone a fence obviously designed to exclude intruders, does not necessarily mean that the playground is "open to the public."

The third problem is that, while the purpose for a fence around a playground can be indicative of whether the playground is "open to the public," such a purpose must be shown by evidence. The State's suggestion about the purpose of the fence in this case—as a safety device—has no basis in the record.[19]

The State also points to the burglary statute which similarly contains the words "open to the public."[20] Citing the Austin Court of Appeals's opinion in *Dominguez v. State*, the State suggests that whether a place is "open to the public," within the meaning of the burglary statute, depends on whether it is obvious or clear to adults that the place is restricted. *See Dominguez v. State*, 363

---

[19] Indeed, the only evidence in the record about the's fence purpose was provided by Smejkal, who testified that the fence was intended to keep balls inside the play area. The trial court sustained Appellant's objection that this testimony was speculative.

[20] (a) A person commits an offense if, without the effective consent of the owner, the person:

(1) enters a habitation, or a building (or any portion of a building) not then *open to the public*, with intent to commit a felony, theft, or an assault . . . .

Tex. Penal Code Ann. § 30.02(a)(1) (emphasis added).

S.W.3d 926, 933 (Tex. App.—Austin 2012, no pet.). Adapting this interpretation of "open to the public" to playgrounds, the State argues that a playground should be "open to the public" within the meaning of § 481.134(a)(3)(B) if it is not obvious or clear to children that the playground is restricted.

We decline to adopt the State's suggestion for two reasons. First, the burglary statute does not require that the place be "open to the public," it requires that the building in question be "*not then* open to the public." *See* TEX. PENAL CODE Ann. § 30.02(a)(1). The difference is subtle but significant; it is elemental. In a prosecution for burglary of a building, the State has the burden to prove that the building in question was "not then open"—in other words, the State must prove it was closed. Evidence that the building was obviously or clearly restricted would be strong evidence that the building was closed. However, the "not then open to the public" element can be proved without evidence of obvious or clear restriction. *See, e.g.*, *Williams v. State*, 537 S.W.2d 936, 937–38 (Tex. Crim. App. 1976) (chaplain's office in hospital was not then open to the public; although hospital lacked signs informing people not to enter after hours, no guards were stationed at entrances to prevent people from entering, the door to the chaplain's suite was open, and the offices were open to the public during visiting hours, the defendant was found after visiting hours inside an inner office behind a closed door).[21]

Conversely, where the offense is a drug offense within proximity of a playground, the State must prove that the playground is "open to the public"—in other words, the State must prove that

---

[21] As the Fort Worth Court of Appeals explained in *Evans v. State*, 677 S.W.2d 814, 818 (Tex. App.—Fort Worth 1984, no pet.), signs at the entrance of a room, indicating the area was closed to the public and only employees of the building were permitted to enter, better inform the public to stay out of the room, but they are not controlling. "[S]igns forbidding entry are not determinative of whether a portion of a building is open to the public." *Id.*

it was not closed. Evidence that the playground was obviously or clearly restricted would be strong *defensive evidence* that the State would have to overcome. The lack of such evidence—that is, where it is not obviously or clearly restricted—however, does not relieve the State of its burden to prove "open to the public."

The second problem with the State's burglary statute-based argument is that the standard it proposes hinges "open to the public" upon the perception of children instead of the public at-large. The State suggests that a playground is "open to the public," for the purposes of § 481.134(a)(3)(B), where it is not obvious or clear to children that the playground is restricted. We do not disagree that a playground may be both "open to the public" and not obviously or clearly restricted in the eyes of children. But the statute uses the words "open to the public," and the public includes the entire community, the people as a whole, which includes both children and adults. *See Public*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/public (last visited Jan. 22, 2021) ("the people as a whole"); *public*, THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (Houghton Mifflin Harcourt Publ'g Co., 5th ed. 2020), https://ahdictionary.com/word/ search.html?q=public (last visited Jan. 22, 2021) ("The community or the people as a whole"); Oxford University Press, *Public*, LEXICO.COM, https://www.lexico.com/en/definition/public (last visited Jan. 22, 2021) ("Ordinary people in general; the community"); *Public*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The people of a country or community as a whole"). Young children may not be able to read a "No Trespassing" sign and appreciate the import of those words, and a playground surrounded by such signs is not obviously or clearly restricted in the eyes of those children. To adults who are part of the "public" that same playground would be obviously or clearly restricted.

Apart from the burglary statute, the State additionally points to the Penal Code's definition of "public place,"[22] and the use of "public road or highway" in the former DWI statute.[23] In regard to these statutes, the State essentially argues that, because "public" has been construed to mean accessible to the public, a playground should be "open to the public" for the purposes of § 481.134(a)(3)(B) if it is accessible to the public.

The State has not cited any case that backs up this proposition and we are not persuaded. The terms "public place," "public road," and "public highway" are all comprised of nouns preceded by the adjective "public." In contrast, "open to the public" is comprised of the collective noun "public" preceded by "open to the" in which open is an adjective. The meaning of the word "public" is significantly different when used as a noun rather than as an adjective, and when one statute uses the word "public" as a noun and another statute uses the word as an adjective it is a real stretch to say that the meaning of the word used as an adjective should also apply to the meaning of the same word when used as a noun. We decline the invitation to do so.

In sum, the evidence in the record that the fence was not completely locked and that Smejkal

---

[22]     "Public place" means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

TEX. PENAL CODE Ann. § 1.07(a)(40).

[23]  Br. for the State at 13 (quoting *Nichols v. State*, 49 S.W.2d 783, 784 (Tex. Crim. App. 1932) (construing "public road or highway" of the former DWI statute, Penal Code art. 802)). The current DWI statute uses "public place":

(a) A person commits an offense if the person is intoxicated while operating a motor vehicle in a *public place*.

TEX. PENAL CODE Ann. § 49.04(a) (emphasis added).

was able to access the playground is not evidence from which a rational jury could conclude that the playground was "open to the public," especially in light of evidence that one gate was locked with a padlock and another gate was behind a walkway secured by a deadbolt locked gate.

### *III(C) — Lay Witness Opinion*

Aside from the evidence of the fence being unlocked, the State argues that other evidence in the record exists to support that the playground was "open to the public." Smejkal testified, without objection, that:

Q [by the prosecutor]. Okay. Is it open to the public, or is it not?

A [by Smejkal]. It is open to the public.[24]

The State argues that Smejkal's testimony amounted to a lay witness opinion, and the State contends that a lay witness opinion can constitute sufficient evidence to establish that the playground was "open to the public." The State further points to Appellant's failure to object to the opinion, and, absent an objection, Smejkal's lay witness "opinion should be given probative value that the playground truly was open to the public."[25]

Yet the State does not cite any authority in support of its position that a lay witness opinion, standing alone, can constitute legally sufficient evidence.[26] While a lay witness may provide an opinion, such an opinion must be rationally based on the witness's perception and helpful to clearly

---

[24]  Rep. R. vol. 4, 88.

[25]  Br. for the State 16–17.

[26]  The State's brief cites authority holding that lay witness opinions are admissible and that the issue of whether a lay witness is competent to provide an opinion is subject to forfeiture under issue preservation rules. Br. for the State 16 (citing *Fairow v. State*, 943 S.W.2d 895, 898–99 (Tex. Crim. App. 1997), *Ex parte Nailor*, 149 S.W.3d 125, 134 n.41 (Tex. Crim. App. 2004), and *Moff v. State*, 131 S.W.3d 485, 491 (Tex. Crim. App. 2004)).

understanding the witness's testimony or to determining a fact in issue. Tex. R. Evid. 701. Absent the bases upon which Smejkal's opinion was formed, his opinion that the playground was open to the public was a factually unsupported inference or presumption. "[J]uries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (quoting *Hooper*, 214 S.W.3d at 15).

As for Appellant's failure to object to Smejkal's opinion, this has no bearing on how the opinion should be treated on sufficiency review. Sufficiency review is not dependent upon whether or not there was an objection to the evidence at trial. *See Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001) ("A claim regarding the sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so."); *Moore v. State*, 371 S.W.3d 221, 225 (Tex. Crim. App. 2012). "In assessing the sufficiency of the evidence to support conviction, a *reviewing court must consider all evidence* which the jury was permitted, whether rightly or wrongly, to consider." *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988) (emphasis in original); *Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004).

In addition to Smejkal's factually unsupported opinion that the playground was "open to the public," the dissent points to Smejkal's testimony during re-direct examination:

Q. And is it your testimony that the gates to that fence, are they locked, or are they unlocked?

A. I believe they are kept unlocked at all times.

Q. Okay. Were they kept -- to your knowledge, were they kept unlocked in December of 2017 [the month of the offense]?

A. I did not go to check to see if they were unlocked on December 7th.

Q. Okay. What makes you say the gates are unlocked?

A. That is through conversations with the pastor of that church.[27]

According to the dissent, Smejkal's belief that the playground was unlocked on the date of the offense and his explanation for that belief can be properly considered as part of the evidence. The dissent would hold that the evidence is sufficient to support the "open to the public" element based on Smejkal's opinion that the playground was open to the public, his belief that the fence was "unlocked at all times," and his explanation that his belief that the fence was "unlocked at all times" was based on a conversation with the pastor. The dissent further argues that Smejkal's belief that the fence was "unlocked at all times" was competent evidence to dispel any inference that the fence was locked on the day of the offense based upon the photographic evidence.

Initially, we note that Smejkal's belief that the fence was "unlocked at all times" is plainly contradicted by Smejkal's own testimony and photographic evidence that the fence was at least partially locked when Smejkal inspected it. Furthermore, assuming, *arguendo*, that the jury had conflicting evidence before it and chose to credit Smejkal's belief that the fence was "unlocked at all times," including the day of the offense, such evidence that the fence was unlocked is not dispositive evidence that the playground contained within was "open to the public." As discussed above, the presence of a fence is not dispositive of whether a playground contained within is "open to the public." A playground is not necessarily "open to the public" due to the lack of a fence, and, absent other evidence, a fence, even an unlocked one, tends to show that a playground is closed to the public. Smejkal's factually unsupported opinion that the playground was "open to the public" does not change that.

---

[27] Rep R. vol. 4, 102. The pastor mentioned by Smejkal did not testify at trial.

*III(D) — The Open Nature of Churches*

Acknowledging *Ingram*, the State argues that, under *Graves*, a jury could reasonably infer that a playground is open to the public based upon evidence of the general nature of the place in question. *See Graves v. State*, 557 S.W.3d 863, 867 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (distinguishing *Ingram* where the playground at issue was at a park, and the parking lot for the park was open and directly accessible from a nearby street). The State points to evidence that the playground was on the grounds of a church to support the "open to the public" element. According to the State, because of the open nature of churches, a playground adjacent to a church carries with it an invitation for children to play there, rendering it "open to the public."

We have no doubt that many churches would gladly allow members of the public, especially children, onto their grounds to enjoy playgrounds. But we cannot presume that every church has as broad of an open nature as suggested by the State, and we cannot presume that every church will welcome all members of the public to use their playgrounds without restriction. We decline to hold that a playground is "open to the public" for the purposes of § 481.134(a)(3)(B) whenever the playground is found on the property of a church. Whether a particular church has this open nature and whether that church welcomes the public to use its playground must be shown by evidence. The evidence shows that although the church did not lock two of the gates in the fence, it attempted to restrict access to the playground by locking one of the gates with a padlock and another gate with a deadbolt.

*III(E) — The Attractive Nuisance Doctrine*

Alternatively, the State argues that the "attractive nuisance" doctrine found in premises liability tort law is highly relevant to whether the alleged playground was "open to the public."

According to the State, the playground in this case, behind a chain link fence, would have been visible and attractive to any children passing by. The State contends that under the attractive nuisance doctrine, those children would be implicitly invited to use the playground, which in turn makes it "open to the public." The State's attractive nuisance argument essentially asserts that evidence that a playground is visible to children is legally sufficient evidence to show that it is "open to the public."

The State's reliance on the attractive nuisance doctrine is unfounded. The attractive nuisance doctrine applies when the property at issue is *not* open to the public. Normally, a property owner does not owe a duty of care to a trespasser on the land and is not liable for any injury that the trespasser suffers on the land, except that the owner owes a duty to refrain from injuring a trespasser willfully, wantonly, or through gross negligence. TEX. CIV. PRAC. & REM. CODE Ann. § 75.007(b); *Tex. Utils. Elec. Co. v. Timmons*, 947 S.W.2d 191, 193 (Tex. 1997). As our sister court explained back in 1943:

> The rule that there is no duty to keep premises safe for trespassers or licensees is for the protection of the property owner. So long as he creates no nuisance, he is entitled to use his property as he sees fit. He is entitled to assume that his possession will not be disturbed by outsiders. It would be placing an unreasonable burden upon him to require that he keep his premises safe for strangers who come uninvited on his land for purposes of their own. Such persons must take the premises as they find them; and if they fall into an unsuspected danger, the loss is their own.

*Tex. Cities Gas Co. v. Dickens*, 168 S.W.2d 208, 210 (Tex. 1943); *see also Baldwin v. Tex. Utils. Elec. Co.*, 819 S.W.2d 264, 266 (Tex. App.—Eastland 1991, writ denied) ("It has long been the law in Texas that a landowner has no obligation to maintain his premises in a safe condition for strangers entering without authorization. The landowner may assume that persons will not penetrate his boundaries uninvited. Trespassers must take the premises as they find them, and, if they are injured

by unexpected dangers, the loss is their own.").

In contrast, to an "invitee" a property owner "owes a 'duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Hillis v. McCall*, 602 S.W.3d 436, 440 (Tex. 2020). "An invitee is 'one who enters on another's land with the owner's knowledge and for the mutual benefit of both.'" *Id.* at 440 n.6 (quoting *Rosas v. Buddie's Food Store*, 518 S.W.2d 534, 536 (Tex. 1975)).

Under the attractive nuisance doctrine, originally developed in so-called turntable cases, "when children of tender years [come] upon the premises by virtue of their unusual attractiveness, the legal effect [is] that of an implied invitation to do so. Such child [is] regarded, not as a trespasser, but as being rightfully on the premises." *Timmons*, 947 S.W.2d at 193 (quoting *Banker v. McLaughlin*, 208 S.W.2d 843, 847 (Tex. 1948)). "When the attractive nuisance doctrine applies, the owner or occupier of premises owes *a trespassing child* the same duty as an invitee." *Id.* (emphasis added). "Had [the injured person] been an adult, *he would have been a trespasser* on [the property], and [if the property owner] did not injure him willfully, it could not be liable for his accident." *Id.* (emphasis added).

The attractive nuisance doctrine's operation, holding a property owner liable for injuries suffered by trespassing children as if they were invitees within the meaning of premises liability law, does not mean that the property owner has implicitly invited children onto his property within the normal meaning of the word "invite." Indeed, he has *not* invited them; they are trespassers. If they were invited in the first place, either explicitly or implicitly, they would be invitees and there would be no need to rely on the attractive nuisance doctrine to subject the property owner to liability.

A playground including slides, swings, and climbing bars could be an attractive nuisance

because it is unusually attractive and alluring to young children. But such a playground could be clearly closed to the public—the owner of the playground could surround it with several "No Trespassing" signs. It would be farfetched to argue that such a playground, surrounded by "No Trespassing" signs, is also "open to the public" simply because it is an attractive nuisance alluring to young children.[28] We decline to hold that a playground is "open to the public" for the purposes of § 481.134(a)(3)(B) because it could be an attractive nuisance.

### III(F) — Legislative History

Next, the State points to a statement found within the legislative history of the drug-free zone statute, in which it is stated that "[d]rug-free zones should be established where we need them most: in areas where children are known to gather, such as schoolyards, public playgrounds, youth centers, and video arcades." S. Comm. on Criminal Justice, Bill Analysis, Tex. S.B. 16, 73rd Leg., R.S. (1993). According to the State, we should construe "open to the public" to mean places "where children are known to gather." We decline the State's suggestion. First, because application of the plain language "open to the public" does not lead to absurd results nor is "open to the public" not plain but rather ambiguous, we will not consider extratextual factors such as a statement of intent within the legislative history. *Boykin v. State*, 818 S.W.2d 782, 785–86 (Tex. Crim. App. 1991). Second, assuming, *arguendo*, that a playground is "open to the public" if it is a place where children are known to gather, there is no evidence in the record that children are known to gather at the

---

[28] Indeed, attractive nuisances can include pits filled with water, *Banker v. McLaughlin*, 208 S.W.2d 843 (Tex. 1948); railway push cars, *Vanover v. Henwood*, 150 S.W.2d 785 (Tex. [Comm'n Op.] 1941); washing machines, *Montgomery Ward & Co. v. Ramirez*, 127 S.W.2d 1034 (Tex. App.—San Antonio 1939, writ dism'd judgm't cor.); poisonous liquid fertilizer, *City of Lampasas v. Roberts*, 398 S.W.2d 612 (Tex. App.—Austin 1966, writ ref'd n.r.e.); and oil rigs, *Burk Royalty Co. v. Pace*, 620 S.W.2d 882 (Tex. App.—Tyler 1981, no pet.).

playground in this case.

## IV — Conclusion

In conclusion, in order to support a conviction for a drug offense committed within a drug-free zone, where the drug-free zone is alleged to be a playground, there must be sufficient evidence to show each of the elements of the statute's definition of "playground." None of the elements, including the "open to the public" element, may be presumed. The evidence in this case—the fact that the fence around the playground was not completely secure, an officer's conclusory statement that the playground was open to the public, the fact that the playground was on the grounds of a church, and the fact that the playground could be seen through the chain link fence—is insufficient to show that the playground was "open to the public." The judgment of the court of appeals is reversed. The cause is remanded to the court of appeals for further proceedings consistent with this opinion.

Delivered: April 14, 2021
Publish

**<u>Appendix A</u>**



STATE'S
EXHIBIT
34

PENGAD 800-631-6989



STATE'S
EXHIBIT
35
PENGAD 800-631-6989



STATE'S
EXHIBIT
36

PENGAD 800-631-6989



STATE'S
EXHIBIT
37

PENGAD 800-631-6989


STATE'S EXHIBIT
38
PENGAD 800-631-6989



STATE'S
EXHIBIT
39

PENGAD 800-631-6989